IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 09-cv-00832-MSK-MEH

TARA WOODS LIMITED PARTNERSHIP,

      Plaintiff,

v.

FANNIE MAE; and
EICHLER, FAYNE & ASSOCIATES, a/k/a EF&A Funding, L.L.C. d/b/a Alliant Capital,
L.L.C.,

      Defendants.

---

### OPINION AND ORDER GRANTING, IN PART, MOTIONS TO DISMISS

---

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Judgment on the Pleadings **(# 46)**, the Plaintiff's response **(# 54)**, and the Defendants' reply **(#**

**63)**; and the Defendants' Motion to Dismiss the First Amended Complaint **(# 67)**, the Plaintiff's

response **(# 72)**, and the Defendants' reply **(# 78)**.

### FACTS

The operative pleading in this action is the Plaintiff's Amended Complaint **(# 65)**.[1]  That

document alleges that in 1999, the Plaintiff borrowed approximately $ 19 million from

Defendant Eichler, Fayne & Assocs. ("EFA") to purchase an apartment complex called Stone

Creek Village.  (The loan was later assigned to Defendant Fannie Mae.)  One of the conditions

---

[1]The facts are drawn from the Complaint's allegations, which are taken as true for
purposes of this motion.

1

of that loan was that the Plaintiff make certain required repairs to the property by May 2000. The parties entered into a separate "Repair and Security Agreement" that required the Plaintiff to place certain funds in escrow with Fannie Mae as security for the repairs being made, and upon completion of the repairs "to the satisfaction of Fannie Mae," the escrowed funds would be disbursed as appropriate. The Plaintiff contends that it completed the repairs to Fannie Mae's satisfaction, but Fannie Mae refused to release the escrowed funds.

In 2005, the Plaintiff sought to sell Stone Creek Village, as well as two other apartment complexes, Vintage Lakes and Springbrook, that were owned by its principal owned. These properties were the subject of other loans made by EFA and assigned to Fannie Mae. At some point in time, Fannie Mae deemed the loans to be in nonmonetary default. Entertaining market-value offers for the Vintage Lakes and Stone Creek properties, the Plaintiff's principal offered to convey the Springbrook property to Fannie Mae in exchange for Fannie Mae's consent to the sale of the other two properties. A representative of Fannie Mae rejected the offer because Springbrook had too little equity, and that Fannie Mae would not allow the principal to "hit a home run" by selling the two more valuable properties. The Plaintiff alleges that this representative "made clear that he was not going to allow [the principal] to make any profit from the sale of the properties." Thereafter, the Defendants commenced foreclosure proceedings with regard to each of the properties.[2]

_____

[2]The Amended Complaint makes several allegations concerning the Defendants' behavior with regard to the Vintage Lakes and Springbrook properties. Because the Plaintiff in this action is not alleged to have any ownership interest in any property other than Stone Creek, the Court understands these allegations are intended to simply provide corroboration of the Defendants' alleged intent to harm the Plaintiff's principal in all of his business dealings, not to assert independent claims for which the nominal Plaintiff here would have no standing.

In late 2006, Fannie Mae commenced foreclosure proceedings on Stone Creek, alleging that the Plaintiff was in default of the loan agreement by failing to maintain the property lien-free, failing to repair and maintain the property, failing to comply with the Denver Housing Code, and failing to maintain required insurance.  The Plaintiff alleges that each of these accusations were false – that it had maintained required insurance, had paid off all liens, and had completed repairs to the satisfaction of the City of Denver.

With specific regard to the contention that the Plaintiff failed to repair the property,  the Plaintiff alleges contends that the accusation was based on a January 2007 Physical Needs Assessment, issued by Fannie Mae after foreclosure proceedings had begun.  The Plaintiff contends that the Assessment failed to give it a reasonable opportunity to address the repair issues, and that the terms of the loan agreement did not permit Fannie Mae to make the Assessment and demand.  The Plaintiff further contends that sufficient funds to make the repairs remained in the escrow account with Fannie Mae, but that Fannie Mae refused to release those monies for that purpose, and instead demanded that the Plaintiff tender several hundred thousand dollars in additional funds to make the repairs.

In March 2007, Fannie Mae dismissed the foreclosure proceeding.  The Plaintiff contends that it incurred "extensive legal fees and costs to contest the baseless foreclosure proceedings." In addition, it contends that the foreclosure proceedings "stigmatized the property" and "disrupted [its] ability to timely sell Stone Creek for a reasonable profit."  The Plaintiff alleges that, in at least one instance, a potential buyer stated that he was aware that the Defendants were going to attempt to foreclose on the property and stated that he would wait to attempt to purchase the property during foreclosure proceedings at a discount.

Although the foreclosure proceeding was dismissed, there remained disputes between the parties. In March 2007, EFA, on behalf of Fannie Mae, notified the Plaintiff of other defaults on the loan, including the issuance of a notice from the City of Denver concerning asbestos on the property.[3] The Plaintiff contends that the asbestos condition required it to conduct extensive repairs, "even though Stone Creek had previously passed two environmental inspections by the Defendants . . . and there had been no change in the condition of the property." The Plaintiff contends that, "due to the high visibility of the asbestos remediation that resulted from Defendants requiring related repairs," potential buyers were discouraged from making offers on the property. As a result, the Plaintiff contends, "the Defendants' conduct unnecessarily and unreasonable interfered with the sale of Stone Creek." The Plaintiff also contends that the Defendants' actions caused the parties to incur additional legal fees and costs, all of which the Defendants demanded the Plaintiff satisfy with additional escrow funds, and that the Defendants' failure to pay contractors out of the escrowed repair funds resulted in the filing of the liens that the Defendants later used to deem the Plaintiff in default on the loans. The Plaintiff alleges that the Defendants also "communicated with the prospective buyers of Stone Creek regarding the alleged necessity for extensive repairs, the alleged presence of high levels of asbestos, and the initiation of foreclosure proceedings," all of which resulted in the reduction of offers to buy the property by $ 15 million. Stone Creek was eventually sold in 2008 for $ 20 million, sufficient to discharge the Plaintiff's entire indebtedness to Fannie Mae.

---

[3]The Plaintiff contends that the asbestos issue was prompted by an "anonymous" phone call to the City of Denver the day before, prompting an investigation of the Stone Creek property. The Plaintiff points out that the Defendants' attorney was present at that inspection and took samples for testing.

The Amended Complaint contains ten causes of action: (i) fraud, presumably asserted under Colorado common law[4], in that the defendants made numerous misrepresentations or omissions of material fact, including the fact that "the Defendants were intending to foreclose on [Stone Creek] by wrongfully refusing to disburse funds from escrow . . . to create a default"; that the Defendants "improperly and secretly conducted inspections of the three properties . . . in violation of the loan documents"; that the Defendants "secretly communicated with potential buyers of [Stone Creek] to discourage their purchase of the properties"; "failed to disclose and concealed its involvement in the [asbestos] inspection"; the Defendants "misrepresented to [the Plaintiff] that it had a basis to pursue a foreclosure but that it would 'work with' [the Plaintiff] because it was attempting to sell Stone Creek"; and that Defendants misrepresented that they "would not pursue a foreclosure action and would release [escrow funds] if [the Plaintiff] paid for certain repairs" then failed to do so; (ii) breach of fiduciary duty, also apparently under Colorado common law, in that the Defendants "were acting as a fiduciary of the Plaintiff with respect to the management of the loan and the administration of the . . . escrow accounts," as well as in providing advice and strategy for selling the properties, and proceeded to breach that duty in various ways as described above; (iii) intentional interference with prospective economic advantage, apparently asserted under Colorado common law, in that the Plaintiffs "had an expected business relationship with potential buyers of Stone Creek" and the Defendants "intentionally caused the potential buyers to not purchase and terminate the purchase agreements"; (iv) civil conspiracy, apparently in violation of Colorado common law, in that the

---

[4]Neither the Complaint, nor the briefing in conjunction with the motion at issue, specify the applicable law.

5

Defendants agreed amongst themselves to "accomplish the acquisition of Stone Creek Apartments through unlawful means and to cause financial losses to the Plaintiff" via the conduct described above (among others); (v) abuse of process, apparently asserted under Colorado common law, in that the Defendants "intentionally initiated foreclosure proceedings when they knew that the events of default which formed the bases of the foreclosure proceedings were created and caused by their improper conduct" and that the Plaintiff was not, in fact, in default, and did so not for the purpose of foreclosing on the property but "to weaken the financial viability of the Plaintiff and its owner"; (vi) breach of the contract and/or the covenant of good faith and fair dealing, apparently under Colorado common law, relating to the Defendants' conduct in enforcing the duties under the loan agreement and other contracts; (vii) violation of the Colorado Consumer Protection Act, C.R.S. §. 6-1-105 *et seq.*, in that the loans by EFA constitute "goods and services" subject to the Act and that the Defendants "engaged in deceptive trade practices . . . by disparaging the property of the [the Plaintiff]"; (viii) negligent supervision, apparently under Colorado common law, in that they failed to ensure that their employees "perform[ed] their duties such that their conduct would not be in violation of the loan agreements and as required by law"; and (x) violation of the Colorado Organized Crime Control Act, C.R.S. § 18-17-101 *et seq.*, in that the Defendants conspired as an "enterprise" to "obtain title to the three properties by devising a plan to set up defaults on the loans," and engaged in acts of mail and wire fraud relating to events discussed above, as well as acts of theft by "failing to dispose of the funds in [the escrow accounts] in accordance with the loan documents" and by "intentionally withholding funds due and owing the Plaintiff and by fraudulently claiming the Plaintiff had breached the loan agreement."

<u>**ANALYSIS**</u>

The Defendants initially moved for judgment on the Plaintiff's initial Complaint **(# 46)**. The Amended Complaint was filed during briefing of that motion. In their instant Motion to Dismiss **(# 67)**, the Defendants contend that the amendment failed to resolve any of the issues raised in the prior motion, and thus stand on those arguments as they relate to the Amended Complaint. With the exception of adding a minor argument regarding the standard of review, the Plaintiff stands on its briefing as to the earlier motion as well. Accordingly, the Court focuses its analysis on the Defendants' Motion for Judgment on the Pleadings, adjudicating the Amended Complaint in light of those arguments.

**A. Standard of review**

A motion for judgment on the pleadings under Fed. R. Civ. P. 12(c) is assessed according to the same standards that govern a motion under Fed. R. Civ. P. 12(b)(6). In other words, the Court accepts as true all well-pled facts in the Amended Complaint and draws all inferences therefrom in the light most favorable to the Plaintiff. *Park University Enterprises v. American Cas. Co.*, 442 F.3d 1239, 1244 (10th Cir. 2006). Judgment should not be granted unless no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law. *Id.* Exhibits attached to the pleadings may be considered in evaluating the motion. *Id.*

The parties argue as to the effect on the analysis of two recent pronouncements from the U.S. Supreme Court. In *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Court clarified what constitutes a "well-pleaded fact" for purposes of a Rule 12 analysis. A pleader is not required to set for "detailed factual allegations," but must offer more than "labels and conclusions," a "formulaic recitation of the elements of a

cause of action," or "naked assertions devoid of further factual enhancement." *Iqbal*, 129 S.Ct. at 1949. The cases make clear that it is <u>facts</u>, not conclusions, that must be pled; "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," including "legal conclusion[s] couched as a factual allegation." *Id.* at 1949-50. Moreover, the facts pled must demonstrate a "plausible" claim, that is, one in which the pleader has shown more than just an abstract "possibility" that the defendant has engaged in actionable misconduct.[5] *Id.* One way in which the Court might conduct its analysis is to "identfy[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and disregard them. Then, faced with only well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

### B. Fraud claim

To plead a claim under Colorado law for fraudulent misrepresentation, a plaintiff must allege: (i) the defendant made a false representation of an existing fact; (ii) the representation

---

[5]The Court took pains to ensure that the word "plausible" is understood to mean that the plaintiff has a demonstrable and concrete belief that a wrong has been committed and the defendant is the person responsible, as opposed to a set of facts in which a wrong might possibly and hypothetically be ascertained, and the defendant might, hypothetically, be a person who might have been responsible for that wrong. For example, in *Twombly*, the Court observed that the plaintiff in an antitrust case had sufficiently pled as a fact that two defendants had engaged in "parallel behavior." However, it found that while parallel conduct <u>might</u> be consistent with the required element of an agreement between the two defendants, "it was not only compatible with, but indeed was more likely explained by, lawful unchoreographed free-market behavior." 550 U.S. at 567. Thus, "the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement." *Id.* at 570.
        The Court makes clear that the "plausibility" requirement is not an invitation to the Court to speculate as to whether well-pleaded facts alleged by the pleader are likely to prove true or not.

was made to induce the plaintiff to act upon it; (iii) the plaintiff acted in reliance upon the fact represented; (iv) the plaintiff suffered a loss; and (v) as a result of plaintiff's reliance on such representation. *See generally Nelson v. Gas Research Inst.*, 121 P.3d 340, 344 (Colo. App. 2005); *compare Williams v. Boyle*, 72 P.3d 392, 399 (Colo. App. 2003) (stating elements as: (i) a knowing misrepresentation of a material fact, (ii) reliance on the material misrepresentation, (iii) the right or justification in relying on the misrepresentation, and (iv) reliance resulting in damages). To plead a claim of fraudulent concealment, a plaintiff must show: (i) the defendant concealed a material fact; (ii) equity and good conscience required that that fact be disclosed; (iii) the defendant's knowledge that the fact had been concealed; (iv) the plaintiff's ignorance of the fact; (v) the defendants intention that the concealment be relied upon; and (vi) the plaintiff's reliance on the concealment, resulting in a loss. *Williams*, *id.* at 399-400. Where the fact allegedly misrepresented is not an existing fact, but rather, a promise to perform a particular act at a future time, the pleader must allege facts showing that, at the time of the promise, the speaker consciously harbored a present intention not to perform the promised act. *Nelson*, 121 P.3d at 343.

Fed. R. Civ. P. 9(b) requires allegations of fraud to be pled "with particularity." This requires the pleader to allege "the who, what, when, where, and how of the alleged fraud" – in other words, "the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-27 (10th Cir. 2006).

Here, the Amended Complaint purports to identify six particular instances of fraudulent representations or omissions by the Defendants. The Court examines each in turn.

The first allegation is that "The Defendants were intending to foreclose on [Stone Creek] by wrongfully refusing to disburse funds from escrow to pay vendors and lien holders to create a default as a basis to foreclose." This allegation is deficient for several reasons. First, it (and practically all allegations in the Amended Complaint) refer to the "Defendants" jointly, despite the fact that EFA and Fannie Mae had discrete legal rights and obligations, and performed discrete acts.[6] Second, the allegation identifies no false representation or concealment of a required disclosure by either Defendant, much less who relied upon such representation/omission and that the reliance was both reasonable and resulted in a loss.[7] Thus, the fraud claim premised

_____

[6] To the extent that this allegation is read to infer an obligation to disclose information, it must be tied to the source of the obligation. The Amended Complaint alleges that, after initially extending the loan, EFA transferred its interest to Fannie Mae and continued only to "service" the loan on Fannie Mae's behalf. Obviously, only one of the Defendants could have the obligation to disclose information, declare a default and or foreclose on the property.

[7] Assuming that the Court could somehow ascertain factual allegations corresponding to a claim for fraudulent concealment of the Defendants' intention to foreclose, such claim would nevertheless be doomed by Colorado's "economic loss rule." That rule provides that relief in tort – *i.e.* fraud – does not lie where the party's injury derives solely from breach of the express or implied duties arising in contract. *Haynes Trane Service Agency, Inc. v. American Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009). In determining whether the rule applies, the Court examines the source of the duty giving rise to the claim: breach of a duty that arises under the terms of the contract must be redressed only in contract; breach of a duty that arises from some other source – *i.e.* tort law – may be redressed in tort. *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d. 282, 290 (Colo. App. 2009). Here, there can be little dispute that the Plaintiff's first fraud claim arises out of the Defendants' alleged failure to carry out the contract's duties in good faith. The loan agreement set forth the parties' various obligations and the circumstances that would constitute a default that could lead to foreclosure. The crux of the Plaintiff's first fraud allegation is that the Defendants exploited their contractual ability to declare a default by requiring needless repairs or withholding payments to contractors, all of which would independently constitute violations of the contract itself. In short, the "duty" giving rise to the Plaintiff's tort claim is nothing more than assertion that the Defendants breached a duty to disclose that they intended to breach its express or implied contractual duties. In these circumstances, the economic loss rule would apply and the Plaintiff's fraud claim is precluded by available contractual remedies.

on the first alleged concealment is subject to dismissal.

The second alleged instance of fraud is that "the Defendants improperly and secretly conducted inspections of [Stone Creek] . . . in violation of the loan documents." Again, this allegation does not assert a fact that was either misrepresented or concealed[8]; it simply asserts that the Defendants breached the contract by conducting inspections when they were not contractually permitted to do so. As such, this allegation does not support a claim for fraud.

The third allegation states "The Defendants secretly communicated with potential buyers of [Stone Creek] . . . to discourage their purchase . . . ." Again, this allegation does not identify a fact that was falsely represented to or concealed from someone; it simply asserts that the Defendants engaged in certain conduct towards others. Stretching this allegation most generously, one might infer that the representations made to potential buyers were false, but there are no allegations that specify the false representations, reasonably reliance upon them and a resulting loss.[9] Viewed from the alternative perspective, the word "secretly" might imply that the Defendants "concealed," something from the Plaintiff. But again, the information that was concealed is not identified, nor are there allegations that the reasonably Plaintiff relied upon the

---

[8]One would have to read an additional, material phrase into the allegation to convert it into one that could even arguably be said to be fraudulent: "The Defendants concealed their intention to improperly and secretly conduct[ ] inspections . . . ."

[9]Earlier in that paragraph, the Plaintiff alleges that "Upon information and belief, Defendants communicated with the prospective buyers of Stone Creek regarding the alleged necessity for extensive repairs, the alleged presence of high levels of asbestos, [etc.]" The Plaintiff does not, however, plead any facts that indicate the source of this "information and belief," other than the averment discussed in the body of this Opinion. When a party seeks to plead a fraud claim based upon allegations made "upon information and belief," the party must "set[ ] forth the factual basis for the plaintiff's belief." *Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir. 1992).

absence of such information to its detriment. [10]   Simply put this allegation is far too vague and incomplete to adequately support a claim for fraud or fraudulent concealment.

The fourth fraud allegation states that the Defendants "failed to disclose and concealed [their] involvement in the" asbestos inspection.  This allegation is defective for many of the reasons discussed above.  The Plaintiff does not plead facts that would show why the Defendants were required to or should have disclosed the fact that they participated in the asbestos inspection.  In addition, there is no allegation that the absence of such information was reasonably relied upon by the Plaintiff to its detriment.  Moreover, the Amended Complaint appears to indicate that the Plaintiff knew of the Defendants' participation, as the attendance of the Defendants' attorney at the inspection was "reflected in the inspection notice."  No claim of fraudulent concealment can lie where the Plaintiff was actually aware of the fact purportedly concealed.

The fifth fraud allegation states that the Defendants misrepresented "that it would 'work with' [the Plaintiff]" to find a buyer, despite the Defendants having a ground to pursue foreclosure.  By definition, this statement is a representation of a promise to perform an act[11] in the future, not a statement of an existing fact.  Thus, the Plaintiff must allege facts to show that the Defendants did not have a present intent to "work with" them to find a buyer at the time the

---

[10] To the contrary, other allegations in the Complaint, tie this allegation to action by a prospective buyer, not the Plaintiff. Paragraph 37 states that "At least one potential buyer of Stone Creek advised a broker that he knew that Defendants were going to attempt to foreclose on the property and that as a result he would wait to attempt to purchase the property."

[11]The Court has some doubt that an inherently ambiguous phrase such as a promise to "work with" the Plaintiff can ever constitute a representation of fact sufficient to give rise to a fraud claim.

statement was made.[12]  The Amended Complaint contains no allegations that the Defendants lacked such an intent when the statement was made.  Accordingly, this allegation is insufficient to support a claim for fraud.

Finally, the Amended Complaint alleges that the Defendants "misrepresented . . . that Defendants would not pursue a foreclosure action and would release insurance money held in escrow to [the Plaintiff] if [the Plaintiff] paid for certain repairs."  This allegation does identify a specific statement of fact – technically, a statement of a present intent to perform future acts ("intent not pursue a foreclosure action," "intent to release insurance money") – and to some extent, identifies who said it ("a conversation between Nick Forrette and Rosann Juracek-Harris"[13]) and when it was said (inferentially, the statement had to be made prior to the date the foreclosure action was commenced on November 30, 2006).  Arguably, then, the statement is pled with sufficient particularity.

However, the alleged falsity turns on the Defendants intent at the time the statements were made.  Thus, to be false, there must be an allegation that when the statements were made, the Defendants did not intend to do these things.  There is no such allegation in the Amended Complaint.[14]

---

[12] The Court notes that the Plaintiff does not allege when the statement was made; indeed, the "work with" statement is not discussed anywhere in the Amended Complaint other than in the fraud claim.

[13] Ms. Harris is identified in the Amended Complaint as an employee of EFA.  The Amended Complaint does not identify Mr. Forrette.

[14] As noted, the Amended Complaint temporally locates the statement only as being made prior to the commencement of foreclosure proceedings, and prior to the performance of the unspecified "certain repairs."  Without the ability to determine specifically <u>when</u> the statement was made, it is impossible to find support in the Amended Complaint for the  assertion that the Defendants did not have an intent to perform their promise at the time it was made.  Nothing in

Thus, the Plaintiff has failed to adequately allege a claim for misrepresentation premised upon this statement.

Because none of the specific allegations in the fraud claim adequately state a claim for relief, the first cause of action for fraud is dismissed.

### C. Breach of fiduciary duty

The Defendants move to dismiss this claim on the grounds that the Plaintiff does not plead facts that would demonstrate the existence of a fiduciary duty assumed by the Defendants.

A fiduciary relationship arises under Colorado law in situations in which one party "has a high degree of control over the property or subject matter of another, or when the benefitting party places a high level of trust and confidence in the fiduciary to look out for the beneficiary's best interest." *MDM Group Assocs., Inc. v. CX Reinsurance Co.*, 165 P.3d 882, 889 (Colo. App. 2007). A confidential relationship may give rise to a fiduciary duty if one party justifiably reposes a special trust and confidence in another such that the reposing party's ordinary vigilance and care is relaxed. *Turkey Creek, LLC v. Rosania*, 953 P.2d 1306, 1312 (Colo. App. 1998). In determining whether a fiduciary duty exists based on a confidential relationship, the party asserting the existence of such a duty must show: (i) either the reposing of trust and confidence in the other party was justified, or the party in whom the confidence was reposed either invited, accepted, or acquiesced in such trust; (ii) the alleged trustee assumed a primary duty to represent the other party's interest in the transaction; (iii) the nature and scope of the duty that arose from that confidential relationship extends to the subject matter of the suit, and (iv) the

_____

the Amended Complaint juxtaposes, temporally or otherwise, a statement by the Defendants regarding the Plaintiff making repairs to the property with facts that show that the Defendants never intended to refund the Plaintiff's escrow funds or forego foreclosure.

duty that was violated, causing damages to the party asserting the existence of the duty. *Equitex, Inc. v. Ungar*, 60 P.3d 746, 752 (Colo. App. 2002).

The Amended Complaint contends that "the Defendants were acting as a fiduciary of the Plaintiff with respect to the management of the loan and the administration of the repair and replacement escrow accounts." It is not clear in what respect the Plaintiff claims that the Defendants' "management of the loan" gave rise to any fiduciary relationship, but with regard to the alleged relationship arising out of "the administration of the . . . escrow accounts," the Plaintiff explains that the Defendants had "qualified discretion" to make "payment of vendors and liens on the Stone Creek Apartments property" with the escrowed funds, and that the Defendants "further had discretion as to a determination of whether repairs, maintenance, or replacements were needed on the property." In addition, the Plaintiffs argue that a second fiduciary duty arose because the Defendants "required [the Plaintiff] to provide information . . . regarding [the Plaintiff's] efforts to sell the property." As a result of having this information, "the Defendants . . . provided advice to [the Plaintiff] with respect to the management of the properties and its strategy for selling the properties."

Normally, one would assume that one party's placing of funds in escrow with another party for management and disbursement would be precisely the kind of situation that would give rise to fiduciary obligations. The Defendants here contend that the terms of the written agreements between the parties warrant a different conclusion. The "Replacement Reserve and Security Agreement," the contract that concerns the escrow account, is specifically referred to the Plaintiff in the Amended Complaint and the parties have not disputed the authenticity of the copy attached to the Defendants' motion. That document required that, beginning in June 1999,

15

the Plaintiff would make monthly deposits of a certain amount of money into an interest-bearing account.  The Defendants were given "the sole right to make withdrawals from such account." The contract provides that the Plaintiff "assigns to [the Defendants] the Replacement Reserve as additional security for all of [the Plaintiff's] obligations under the Loan Documents," but provides that the Defendants "shall make disbursements from the Replacement Reserve in accordance with the terms of this Agreement."  Among other things, the agreement requires the Defendants to "reimburse [the Plaintiff] for the costs of" certain repair items listed in the contract upon satisfaction of stated requirements.

Assuming the Replacement Reserve and Security Agreement created some fiduciary-type duty in the Defendants with regard to the escrowed funds, the Court finds merit in the Defendants' argument that any breach alleged in the Amended Complaint is one of the contract's terms itself, not any collateral fiduciary duty.  The crux of the Plaintiff's contention on this point is that the Defendant refused to use the escrowed funds to pay contractors who had performed repairs on the property, even though the contract called for the Defendants to do so.  The Defendants' failure, then, would constitute a breach of the contract's express or implied terms, giving rise to a remedy in contract only.  *See Micale v. Bank One, N.A.*, 382 F.Supp.2d 1207, 1221-22 (D. Colo. 2005) (fiduciary duty must arise from obligations "not contemplated under the terms of the contract").  Under these circumstances, the "economic loss rule" bars the Plaintiff from recovering in tort – such as a claim for breach of fiduciary duty – for injuries sustained as a direct result of the Defendants' alleged breach of contractual terms.[15]   To the extent the breach

---

[15]The Plaintiff essentially concedes as much.  In responding to the Defendants' invocation of the economic loss rule with regard to the breach of fiduciary duty claim, the Plaintiff refers to the fiduciary duty created by the sharing of sales information and strategy as

of fiduciary duty claim is premised upon the Defendants' failure to make proper reimbursement payments out of the repair escrow account, the claim is dismissed in favor of the Plaintiff's breach of contract claim.

Separately, the Plaintiff asserts that a second fiduciary duty arose between the parties because the Defendant demanded (and the Plaintiff supplied) "information . . . regarding [the Plaintiff's] efforts to sell the property," and the Defendants thereafter "had discussions . . . and provided advice . . . with respect to the management of the properties and [the Plaintiff's] strategy for selling the properties." As previously mentioned, to plead a claim based on this alleged fiduciary duty, the Plaintiff must plead, among other things, facts that would show that the Defendants "invited" the Plaintiff to place trust and confidence in the Defendants with regard to this information, and that the Defendants "assumed a primary duty" to represent the Plaintiffs' interests with regard to investigating potential buyers and devising a sales strategy. The facts pled in the Amended Complaint, even when taken in the light most favorable to the Plaintiff, only hint at the former and give no indication whatsoever with regard to the latter. The Amended Complaint alleges only that the Defendants "required [the Plaintiff] to provide information" regarding efforts to sell the property, even though such sharing of information was not a contractual requirement. This largely conclusory assertion might arguably permit an inference that the Defendants "invited" the Plaintiffs to repose confidential information in the Defendants about prospective buyers of Stone Creek. But that bare assertion – and nothing else in the Amended Complaint elaborates on the issue – does not permit the Court to infer that, by

---

existing outside the terms of the parties' contracts, not a fiduciary duty arising out of the Replacement Reserve Agreement.

demanding the information, the Defendants somehow manifested a willingness to thereafter act in the Plaintiff's interests in discussing the potential sale of Stone Creek. Similarly, the mere fact that the Defendants gave advice to the Plaintiff or discussed strategies in how to best market and sell Stone Creek does not give rise to an inference that the Defendants intended to assume a fiduciary duty to act for the Plaintiff in aiding in the sale of the property. Because the Amended Complaint does not plead facts from which the Defendants' intent to assume a fiduciary duty to the Plaintiff concerning attempts to sell Stone Creek can be plausibly inferred, the fiduciary duty claims are dismissed.

### D. Intentional Interference claims

The Plaintiff asserts two separate but similar tort claims: intentional interference with contractual relations and intentional interference with prospective economic advantage. Except in one respect, the elements of the claims are the same; the Plaintiff must allege: (i) it had either a valid existing contract with a third party or that it expected to enter into a contract with a third party; (ii) the Defendants induced or otherwise caused the third party to breach the contract or not enter into the contractual relation; and (iii) the Defendants did so intentionally and via improper means. *Harris Group, Inc. v. Robinson* 209 P.3d 1188, 1195-96 (Colo. App. 2009).

Here, the Defendants contend that the Plaintiff has not alleged the existence of a valid contract or expected contract, has not alleged actions constituting improper interference, and that any such claims are barred by the statute of limitations. Turning to the first point, the Plaintiff responds that the Amended Complaint alleges both the existence of a valid contract with a prospective buyer for the purchase of Stone Creek and expected contracts with other prospective buyers. Paragraph 12 of the Amended Complaint states that the Plaintiff posted Stone Creek for

sale on May 25, 2005 and that "there were numerous offers to purchase Stone Creek starting from $35,600,000." Notably, the language in the Amended Complaint is "offers to purchase," not "agreements," and nowhere does the Plaintiff allege that it actually entered into an actual contract for the purchase of Stone Creek with any buyer.[16] This failure is sufficient to justify dismissal of any claim for intentional interference with contract.

As to claims of interference with prospective business advantage, Colorado adopts the tort as reflected in the Restatement (Second), Torts, § 766B. *Harris, id.* at 1196, *citing Dolton v. Capitol Federal Sav. & Loan Assn.*, 642 P.2d 21, 23 (Colo. App. 1981). Comment c to that section explains that the protected 'prospective contractual relation' is "not used in this Section in a strict, technical sense." Purposeful, improper interference with discussions that might lead to a formal, binding contract is actionable, as is such interference with prospective quasi-contractual agreements or even "the voluntary conferring of commercial benefits in recognition of a moral obligation." *Id.* Here, although the Plaintiff has not alleged that it actually entered into a contract with a prospective buyer, it adequately contends that it received purchase offers from prospective buyers that, presumably with further negotiation, would have led to an actual sale. This is sufficient to allege a prospective business advantage so as to support this claim.

As to the second point – whether the Defendants engaged in improper means to squelch the Plaintiff's prospective business – such claims are assessed in light of a multi-factor analysis that inquires into, among other things, (i) the nature of the interfering conduct; (ii) the actor's

---

[16]The Amended Complaint makes a passing reference to the Defendant requiring the Plaintiff to provide "purchase agreements," but it does not allege that these were contracts duly executed by a buyer, as opposed to being draft purchase agreements being exchanged between the Plaintiff and the prospective buyer for review and comment

motive; (iii) the relations between the parties; and (iv) the proximity of the conduct to the alleged interference. *Harris*, 209 P.3d at 1196. The Court finds that the Plaintiff has adequately alleged that the Defendants engaged in intentional, wrongful conduct designed to stymie a potential purchase of Stone Creek. The Plaintiff contends that a Fannie Mae representative threatened to act to prevent the Plaintiff from ever making a profit on the property, and that thereafter, Fannie Mae improperly declared the loan agreement in default and subject to foreclosure, and otherwise required the Plaintiff to incur expensive repairs that made selling the property for the prices offered by the prospective buyers impractical. At this early stage of the litigation, the Court finds these allegations sufficient to state a claim for tortious interference with prospective business advantage.

However, the Defendants raise a cogent argument that such claims are likely barred by the statute of limitations. The parties agree that, in Colorado, a claim for tortious interference with prospective business advantage is subject to a two-year statute of limitations. C.R.S. § 13-80-102(1)(a). The Plaintiff commenced this action in state court on March 11, 2009, and thus, the tortious interference with prospective advantage claim must have arisen no earlier than March 11, 2007. The Amended Complaint appears to locate the initial attempts to sell Stone Creek – attempts frustrated by the Defendants' actions – in 2005, making those claims long stale.

The Plaintiff's response to this argument is somewhat unclear. The Plaintiff states that its claim "arises from Defendants' on-going improper conduct," appear to argue for some sort of "continuing violation" tolling of the statute of limitations, but cites no authority for such a proposition. Colorado limits the application of the "continuing violation" doctrine to

employment discrimination cases. *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 405 (Colo. App. 2000). Alternatively, the Plaintiff argues that the claim did not accrue until it actually sold Stone Creek in May 2008, as it was only then that the Plaintiff suffered a reduced sale price compared to prior offers. For this proposition, the Plaintiff cites to *Colburnt v. Kopit*, 59 P.3d 295, 296 (Colo. App. 2002). *Colburnt* stands for the unremarkable proposition that a claim accrues when the claimant has knowledge of facts that would put a reasonable person on notice that he had suffered an injury that was caused by the wrongful conduct of another. *Id.*

Here, the Plaintiff's theory is that the Defendants falsely declared defaults, sought to foreclose on the property, and otherwise engaged in actions so as to discourage prospective purchasers from buying. The Amended Complaint makes clear that the Plaintiff put Stone Creek up for sale in May 2005; received an offer at an undisclosed time thereafter; was threatened by Fannie Mae on November 7, 2006, that it "was not going to allow [the Plaintiff] to make any profit" on the sale; and that Fannie Mae commenced foreclosure proceedings on November 30, 2006. To the extent these actions interfered with any prospective buyers, the actions were completed and known to the Plaintiff long before March 11, 2007, and thus, claims premised on these actions are untimely.

The Amended Complaint identifies only a handful of actions occurring after March 11, 2007. It notes that the foreclosure proceeding was withdrawn by Fannie Mae on March 27, 2007, but this event is inconsequential to an interference with business advantage claim – if anything, the withdrawal of the foreclosure proceedings made it more likely that prospective buyers would make offers to the Plaintiff to purchase the property. The Amended Complaint also notes the events of March 22-23, 2007, when the City of Denver conducted an asbestos

investigation of the property and required the Plaintiff to undertake lengthy and expensive asbestos abatement. Although a claim that prospective buyers were discouraged by this event might be timely, the Court finds that a claim premised upon the asbestos inspection fails to state a claim because the conduct involved cannot constitute "improper" interference. It is undisputed that, regardless of whoever called the City of Denver to complain about the asbestos issue, the City found that the asbestos contamination required immediate abatement. As *Harris* explains, the factors bearing on the question of whether interference with a prospective business advantage is "improper" include examination of "the social interests" implicated by the challenged action. Here, even assuming that the Defendant reported the asbestos condition out of ill motive towards the Plaintiff, the Court finds that the public interest in prompt disclosure of a dangerous building condition outweighs any private interest that the Plaintiff might have in requiring the Defendant to keep its knowledge of that information concealed.[17] Thus, although timely, no cognizable claim premised on the asbestos incident can be asserted here.

That leaves the Plaintiff with the contention in Paragraph 30 that, on March 23, 2007, the Defendants declared a series of additional defaults on the property, relating to the failure of the Plaintiff to notify the Defendants of a change in management, certain unperformed (non-asbestos) repairs, and the existence of mechanics' liens. The Plaintiff alleges that these defaults

---

[17]Taken to its logical end, the Plaintiff's premise is ill-supported. One assumes that, if the Defendant was aware of a dangerous asbestos condition in the property, the Plaintiff was as well. If the Plaintiff was aware of this condition, it undoubtedly had a legal obligation to disclose the condition to any putative buyer, and either arrange to abate the condition prior to closing the sale or discounting the price to reflect the buyer's abatement responsibilities. The fact that the Defendant may have forced the Plaintiff's hand by reporting the condition to the City of Denver does not alter the fact that the condition would have to have been disclosed to any potential buyer in any event.

were unfounded, and there are allegations in the Amended Complaint that suggest that these actions were motivated by an improper purpose of discouraging prospective buyers from making offers on the property. Although the Amended Complaint does not specifically recite the existence of putative buyers occurring on or after May 23, 2007, the Court will assume from the Plaintiff's general allegations that such buyers existed. Thus, the tortious interference with prospective business advantage will be limited to situations in which buyers were allegedly discouraged from extending offers as a result of the Defendants improper noticing of non-asbestos-related defaults on March 23, 2007. In all other respects, the tortious interference claims are dismissed.

### E. Civil conspiracy

The Plaintiff asserts a "claim" for common-law "civil conspiracy." Although courts often refer to civil conspiracy as a "claim," it is not truly a substantive cause of action. Conspiracy is a "derivative cause of action that is not actionable *per se*," and is essentially a means of holding one defendant liable for the substantive wrongs committed by another. *See Double Oak Const., LLC v. Cornerstone Development Intl. LLC*, 97 P.3d 140, 146 (Colo. App. 2003). For example, if the Plaintiff could not show that EFA itself engaged in any actionable conduct of its own accord, but could show that EFA conspired with Fannie Mae to accomplish a certain goal through Fannie Mae's actions alone, the doctrine of civil conspiracy might allow EFA to be held liable for damages caused by Fannie Mae carrying out the object of the conspiracy. *See id.*

In this sense, then, the civil conspiracy "claim" is superfluous. The Plaintiff has alleged that both Defendants jointly engaged in all of the substantive unlawful conduct herein (or,

alternatively, has argued that EFA engaged in certain acts as Fannie Mae's agent, nevertheless binding both entities to liability.) A conspiracy allegation will become necessary only if the Court determines that the Plaintiff lacks evidence that a Defendant personally participated in a particular unlawful act; upon proof that the Defendant nevertheless conspired to bring about that act, the Court could still hold that Defendant liable for damages resulting therefrom.

Thus, the Court will not adjudicate the Defendants' challenges to the civil conspiracy claim at this time. As noted above, the claim is entirely derivative, and thus, it depends upon the Plaintiff both proving wrongdoing by one Defendant and the lack of actual participation in that wrongdoing by the other. Should the Court conclude that those conditions are met, then, and only then, will it examine whether the Plaintiff can prove the existence of a civil conspiracy sufficient to hold the non-acting Defendant liable for the unlawful act.

### F. Abuse of process

To state a claim for abuse of process under Colorado law, the Plaintiff must show: (i) that the Defendants invoked a judicial process; (ii) that they did so with an ulterior purpose; (iii) that their use of the process was in a manner that was inconsistent with its proper use; and (iv) that the Plaintiff suffered damage as a result. *Moore v. Western Forge Corp.*, 192 P.3d 427, 438 (Colo. App. 2007). Abuse of process lies where a party invokes legal proceedings not for their intended purpose, but in an effort to obtain collateral results that would not be available by the normal operation of such proceedings. *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App.1994), *citing Restatement*, 2d <u>Torts</u>, § 682, comment b (no claim lies "when the process is used for the purpose for which it is intended, [even though] there is an incidental motive of spite or an ulterior purpose"). For example, a party engages in abuse

of process when he files liens against his adversary, not because the filer claims an interest in the property, but to compel the adversary to concede a child custody proceeding. *James H. Moore*, 892 P.2d at 373, *citing Scozari v. Barone,* 546 So.2d 750 (Fla. App.1989).

Here, the Plaintiff alleges that the Defendants commenced a foreclosure proceeding on Stone Creek, premised on sham "defaults" of the loan agreement. The Amended Complaint states that "the principal reason for Defendants' actions was other than to foreclose on the Stone Creek Apartments, but rather, to weaken the financial viability of the Plaintiff and its owner . . ., to ensure that Plaintiff was required to pay the entire debt[,] to obtain title and possession of all three properties, and ultimately to obtain a personal judgment against [the Plaintiff's principal]." Other than the first stated purpose – the goal of "weaken[ing] the financial viability of the Plaintiff" – all of the purposes stated are bona fide reasons for a lender invoking a foreclosure remedy. The purpose of foreclosure is to ensure that the lender receives full payment of the debt or, in the alternative, to take possession of the collateral and is the first step in obtaining an excess judgment against the borrower personally. Although the Amended Complaint also alleges an ulterior motive – the Defendants' desire to financially weaken the Plaintiff – the presence of an ulterior motive does not give rise to a cause of action where the process is otherwise invoked for its normal purpose. *James H. Moore*, 892 P.2d at 373. The Plaintiff admits that the Defendants invoked the mechanism of foreclosure in an attempt to take over the property. Because this is the intended function of the foreclosure process, no cognizable abuse of process claim is stated.

### G. Breach of contract/ covenant of good faith and fair dealing

The Defendants concede that, in light of the Amended Complaint, the Plaintiff has

adequately stated a contractual claim against Fannie Mae. The Defendants contend that no such claim is stated against EFA and that any contractual claim against EFA should be dismissed. The Court finds that the Plaintiff has stated a variety of theories that might give rise to EFA's liability, in part or whole, for Fannie Mae's breaches of the contract, including direct liability (*i.e.* EFA, as servicer of the loan, had the ability to direct unnecessary repairs and deem the loan to be in breach), liability as Fannie Mae's agent, and liability for conspiracy. Whether the Plaintiff can ultimately establish both Fannie Mae's breach of the contract and EFA's personal liability therefor is an issue that must await substantive factual development.

### H. Colorado Consumer Protection Act

To state a claim under the Colorado Consumer Protection Act, the Plaintiff must allege: (i) that the Defendant engaged in an unfair or deceptive trade practice; (ii) the practice occurred in the course of the Defendant's business; (iii) the practice significantly impacts the public as actual or potential consumers of the Defendant's goods or services; (iv) the Plaintiff suffered injury to a legally-protected interest; and (v) the challenged practice caused the Plaintiff's injury. *Park Rise Homeowners Assn. v. Resource Constr. Co.*, 155 P.3d 427, 434-35 (Colo. App. 2006). Although the Defendants allege that the Plaintiff has failed to state several of these elements, the Court limits is analysis to the question of whether the Plaintiff adequately alleged that any deceptive practices engaged in by the Defendants "significantly impact[ ] the public."

A wrong that is "private in nature, and does not affect the public," does not give rise to liability under the Act. *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Linings, Inc.*, 62 P.3d 142, 149 (Colo. 2003). Thus, where the challenged conduct amounts to nothing more than a breach of a private contract between the parties, it is difficult to conceive of a public interest in

the matter.  *Id.* at 150.  Here, the "deceptive practices" that the Plaintiff alleges relate entirely to the way in which the Defendant has handled the particular loan to the Plaintiff; put differently, the Plaintiff does not allege that, for example, the Defendants made false representations concerning the benefits or features of their products in advertising that was disseminated to a large number of consumers.  *Id.* (contrasting a case in which the defendant's performance of a contract was allegedly deceptive but its advertising contained no deception with a case "where we concluded that the defendants' widespread advertisements had a significant public impact because the public was told important facts by the defendant which were untrue").  In short, the Plaintiff alleges only that the Defendants have engaged in deceptive practices towards the Plaintiff, not that the Defendants' deception has been perpetrated on the public at large.

The Plaintiff argues that because Fannie Mae has the ability to engage in the same type of deceptive practices with hundreds of thousands of properties it is the lender on, the conduct here has a public impact.  This argument is not only speculative and unsupported by allegations in the Amended Complaint, it is also legally insufficient.  The fact that the alleged deceptive practice is one which could be replicated with other consumers is insufficient to allege that the practice did indeed "impact the public."  The Colorado Supreme Court reached a similar conclusion in *Rhino Linings*.  There, the plaintiff had promised the defendant an exclusive sales territory, then entered into a contract with another party that effectively allowed that party to sell in the same territory as the defendant.  In finding that this breach of the contract did not give rise to a Consumer Protection Act claim because the public was not impacted by the conduct, the Colorado Supreme Court observed that "Three affected dealers out of approximately 550 worldwide does not significantly affect the public."  *Id.*  Obviously, the plaintiff in *Rhino* could

just as easily have breached that same contractual exclusivity provision with other dealers, just as Fannie Mae could breach its loan agreements with other borrowers besides the Plaintiff, but absent an allegation that it had actually done so, no public interest is implicated by an allegation that the Defendants simply engaged in a private wrong as against only the Plaintiff. Accordingly, the Court finds that the Plaintiff has failed to state a claim under the Colorado Consumer Protection Act.

## I. Negligent supervision

The Plaintiff alleges that the Defendants are liable for failing to properly supervise their employees, who in turn mismanaged the Plaintiff's loan and violated the loan agreements. Without engaging in an extensive discussion of the tort of negligent supervision, the Court observes that liability for negligent supervision lies only where the improperly-supervised employee causes harm by acting <u>outside</u> the scope of employment. *Smith v. Multi-Financial Securities Corp.*, 171 P.3d 1267, 1271 (Colo. App. 2007). This is a logical element: when the employee is acting <u>within</u> the scope of his employment, the employer is liable for any wrongs that the employee commits under the doctrine of *respondeat superior*, and thus, a remedy in tort is required only when the employee strays from his job duties and takes wrongful actions that the employer did not request, but which the employer could reasonably have foreseen. *Id.* Here, the Plaintiff does not allege (nor do the Defendants) that the Defendants' employees' actions in handling the loan were not authorized by the Defendants and fell outside the scope of the employees' duties. Under these circumstances, no claim for negligent supervision lies.

## J. Colorado Organized Crime Control Act

Finally, the Court turns to the Plaintiff's pleading of a violation of the Colorado

Organized Crime Control Act. C.R.S. § 18-17-106(7) provides for a civil remedy for any person injured by what would otherwise constitute a criminal violation of the Act, C.R.S. § 18-17-104. Distilled to its essence, to plead a claim under that Act, the Plaintiff must allege that the Defendants: (i) joined with one another or third parties to form an "enterprise," (ii) that the enterprise engaged in a "pattern of racketeering activity." C.R.S. § 18-17-104(3). An "enterprise" is simply any association in fact of any two or more persons or entities, whether constituting a legally-chartered entity or simply an association in fact. C.R.S. § 18-17-103(2). A "pattern of racketeering activity" is established by showing that at least two acts of "racketeering activity," as that term is defined in C.R.S. § 18-17-103(5) were committed by a member of the enterprise, and that those predicate acts of racketeering activity which "relate to the conduct of the enterprise." *People v. Chaussee*, 880 P.2d 749, 757-58 (Colo. 1994). "Racketeering activity" under C.R.S. § 18-171-103(5) include all acts defined as such by 18 U.S.C. § 1961(1)(A)-(D), such as violent felonies and federal mail and wire fraud, and certain specified crimes under Colorado law, including violent felonies and theft under C.R.S. § 18-4-401. The statute was modeled after the federal RICO Act, 18 U.S.C. 1961 *et seq.*, and is generally interpreted according to the same principles, unless Colorado courts have expressly construed the state statute otherwise. *People v. Hoover*, 165 P.3d 784, 798 (Colo. App. 2006).

The Defendants contend, among other things, that the Plaintiff has not adequately pled a "pattern of racketeering activity." The Plaintiff contends that it has pled predicate acts of mail fraud and theft.[18] For the reasons stated above, the Court finds that the Plaintiff has failed to

---

[18]The Plaintiff also alleges predicate acts of "conspiracy." A conspiracy must have, as its object, some criminal conduct in order to constitute a predicate act of racketeering. The Plaintiff has not identified what discrete criminal activities these "conspiracies" engaged in, and thus, the

adequately plead any fraudulent statement, and thus, has failed to adequately plead a predicate act of mail or wire fraud. That leaves allegations of theft. At best, the Amended Complaint alleges that the Defendants converted money belonging to the Plaintiff when they failed to disburse funds in the escrow account to contractors or to the Plaintiff. Assuming – without necessarily finding[19] – that the Defendants' alleged exercise of improper dominion over the funds in the escrow account constituted "theft" under Colorado law, that constitutes only a single act of racketeering activity. To plead a "pattern" of such activity, the Plaintiff must allege <u>two</u> or more acts. Because, at best, the Plaintiff alleges only one instance in which the Defendants committed theft of the escrowed funds, the Plaintiff has failed to adequately plead a claim under the Organized Crime Control Act.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Judgment on the Pleadings **(# 46)** and Motion to Dismiss the First Amended Complaint **(# 67)** are **GRANTED IN PART**, insofar as the Plaintiff's claims for fraud, breach of fiduciary duty, tortious interference with contract, abuse of process, violation of the Colorado Consumer Protection Act, negligent supervision, and violation of the Colorado Organized Crime Control Act are **DISMISSED** for failure to state a claim, and **DENIED IN PART**, insofar as the Plaintiff has adequately pled claims against both

---

Court limits its analysis to specifically-alleged criminal acts in determining whether the Plaintiff has pled a pattern of racketeering activity.

[19]Contractually, the Plaintiff agreed to give dominion over the escrow account to the Defendants, and conferred upon the Defendants considerable discretion as to when and how to disburse the funds. Even assuming that the Plaintiff can show that the Defendants abused that discretion, thereby breaching the parties' contract, the scienter element required for proof of the crime of theft is considerably higher.

Defendants for tortious interference with prospective business advantage and breach of contract / breach of the covenant of good faith and fair dealing, as set forth herein.

Dated this 12th day of August, 2010

**BY THE COURT:**

Marcia S. Krieger
United States District Judge